UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:11-CV-00054

HAROLD BRANTLEY                                                                Plaintiff

v.

SAFECO INSURANCE COMPANY OF AMERICA                               Defendant

## MEMORANDUM OPINION

This matter is before the Court upon Defendant Safeco Insurance Company of America's Motion in Limine, (Docket No. 34), and Motion for Summary Judgment, (Docket No. 35). Plaintiff Harold Brantley has responded to both, (Docket Nos. 36; 38), and Defendant has replied, (Docket Nos. 37; 39). These matters are now ripe for adjudication. Because they are necessarily intertwined, the Court will address both Defendant's Motion in Limine and Motion for Summary Judgment in this Opinion.

The Court, having reviewed the parties' submissions and being otherwise sufficiently advised, for the reasons that follow;

IT IS HEREBY ORDERED that Defendant's Motion in Limine, (Docket No. 34), is GRANTED;

Further, Defendant's Motion for Summary Judgment, (Docket No. 35), is GRANTED. An appropriate Order will issue separately.

BACKGROUND

Plaintiff Harold Brantley is the owner of residential rental property located in Warren County, Kentucky, at 186 Oak Street, Plum Springs.  Plaintiff contracted with Defendant Safeco Insurance Company of America for a "Landlord Protection Policy" with an effective policy period of November 21, 2008, through November 21, 2009.  On June 11, 2009, a severe thunderstorm consisting of high winds, heavy rain, and hail hit Warren County.  Plaintiff claims that as a result of that storm, he sustained damage to his property.  (*See* Docket No. 38, at 1.)  Plaintiff submitted a claim for damage to the interior of the property, asserting that the damage was covered by the policy.

After Plaintiff submitted his claim, Defendant sent its investigator, Alan Roemer of Pacesetter Claims Services, Inc., to examine the property.  Roemer inspected the property on June 28, 2009, and took photographs of the interior and exterior, which Defendant maintains "showed there was no damage to the flat metal roof from a tree limb and that water had entered the house from ground level causing mold and mildew to grow."  (Docket No. 35-1, at 4.)   On July 1, 2009, Defendant wrote to Plaintiff denying his claim on the basis that it was not a covered loss.  In that letter, Defendant relayed the results of its investigation and recited the relevant policy provisions it relied upon to conclude that the damage was not the result of a covered peril.  (*See* Docket Nos. 35-1; 35-6.)

Then on June 22, 2010, Plaintiff, though counsel, wrote to Defendant requesting that Defendant reevaluate his claim, and submitted photographs that he claimed showed a part or parts of the ceiling had collapsed due as a result of the storm.   Defendant

thereafter commissioned a civil engineer, Charles Skaggs, P.E., to examine the property. Skaggs reviewed Roemer's earlier photographs, inspected the property, and took a number of photographs himself.  Skaggs submitted his report, which was cosigned by another civil engineer, Kate Dicks, P.E., to Defendant on August 30, 2010.  (*See* Docket Nos. 35-1, at 5, 7; 35-7; 35-8.)

Plaintiff filed his initial complaint in Warren County Circuit Court on September 16, 2010, alleging breach of his insurance contract, as well as common law bad faith and violations of the Kentucky Unfair Claims Settlement Practices Act (UCSPA), Ky. Rev. Stat. § 304.12-230.  (Docket No. 1-1.)  Defendant removed this action on diversity grounds on April 1, 2011, and this Court subsequently denied Plaintiff's motion to remand.  (Docket Nos. 1; 11).  On December 1, 2011, the Court granted Defendant's motion to bifurcate this matter into two separate proceedings, the first encompassing Plaintiff's breach of contract claim and the second his claims of bad faith.  (Docket No. 27.)  During the discovery that followed, Defendant deposed Plaintiff's proffered expert witness, David Elliot, on May 4 and Plaintiff's maintenance man, Tim Decker, on May 18, 2012.  (*See* Docket Nos. 34-4; 35-9.)  Defendant also deposed Lonnie Cook, the contractor who performed repairs at the property, and Plaintiff's daughter, Sandy Billingsly, who acted as Plaintiff's property manager.[1]

---

[1] The relevant transcripts for these deponents have not been submitted to the Court.  Plaintiff briefly summarizes these deponents' testimony as deponent Cook "confirm[ing] . . . that the residence was in excellent condition at the time of the storm event," and deponent Billingsly "confirm[ing] that the premises had been rented at the time of the storm event and that the new tenants were in the process of moving in." (Docket No. 38, at 2.)  Despite that this testimony does not seem particularly pertinent to the issues presented here, the Court nonetheless remains mindful of the existence of this evidence for purposes of summary judgment.

On June 18, 2012, Defendant moved to exclude "those portions of David Elliot's deposition testimony . . . from evidence and at trial that speculate about the cause of the damage to Plaintiff's property," arguing that Elliot's opinions lacked the requisite degree of certainty required for admissibility.  (Docket Nos. 34, 34-1.)  Plaintiff responded, arguing that Elliot's opinions: "are succinct, clear, and unequivocal.  They are clearly based upon sufficient facts and borne out by the evidence of record.  There is absolutely no speculation or conjecture within these opinions . . . ."  (Docket No. 36, at 3.)  Then on June 27, 2012, Defendant moved for summary judgment, arguing: (1) that Plaintiff failed to bring suit within the one-year period as required by the insurance contract; (2) that the policy did not cover Plaintiff's loss, because any covered loss in this instance is excludable from coverage by the policy's concurrent-loss provision; (3) that because the opinions of Plaintiff's expert should be excluded, Plaintiff has not established that the cause of damage to his property was covered by the insurance policy; and (4) that Plaintiff cannot maintain his bad-faith claims as a matter of law.  (Docket No. 35.)

## STANDARD

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; he must present evidence on which the trier of fact could reasonably find for him. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012).

Finally, while the substantive law of Kentucky is applicable to this case pursuant to *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity applies the standards of Federal Rule of Civil Procedure 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993), *abrogated on other grounds by Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010)).

DISCUSSION

## I.      Plaintiff's Action is Time-Barred by the Applicable One-Year Contractual Limitation Period.

Defendant argues that Plaintiff's action should be dismissed because he failed to file this action within the one-year limitation period prescribed by the policy.  Based on a review of Kentucky caselaw and federal courts' interpretation of that law, the Court agrees.

Ky. Rev. Stat. § 304.14-370 provides:

> No conditions, stipulations or agreements in a contract of insurance shall deprive the courts of this state of jurisdiction of actions against foreign insurers, or limit the time for commencing actions against such insurers to a period of less than one (1) year from the time when the cause of action accrues.

In *Webb v. Ky. Farm Bureau Ins. Co.*, the Court of Appeals of Kentucky expressly held that an insurance policy provision that limited the time for filing suit against the insurer to one year after the inception of the insured's loss was enforceable and not against public policy in Kentucky.  577 S.W.2d 17 (Ky. Ct. App. 1978).  In *Webb*, the policy provision at issue read, "No suit or action on this policy for recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within twelve months next after the inception of loss."  *Id.* at 18.  The insured argued that because Ky. Rev. Stat. § 413.090(2) specifically allows a fifteen-year limitation period for contract-based claims, the insurance policy's one-year limitation conflicted with the general statute of limitations.  *Id.* at 17-18.  The Kentucky court disagreed.  Relying on a pair of recent decisions by the Nebraska

Supreme Court, the appellate court reasoned that because Kentucky has "no statute proscribing contractual shortening of limitation periods" and, further, because Ky. Rev. Stat. § 304.14-370 "allows foreign insurers to limit actions against them to one year," the public policy of Kentucky favors the enforcement of a provision whereby an insurer limits the time for bringing an action against it. *Id.* at 18.  In reaching this conclusion, the Kentucky court cited a litany of Kentucky decisions enforcing the reasonable shortening of the statutory period as consistent with the public interest.  *Id.* at 19 (citing *Burlew v. Fidelity & Cas. Co. of N.Y.*, 122 S.W.2d 990 (Ky. 1938); *Johnson v. Calvert Fire Ins. Co.*, 183 S.W.2d 941 (Ky. 1944); *Stansbury v. Smith*, 424 S.W.2d 571 (Ky. 1968); *Robert F. Simmons Constr. Co. v. Am. States Ins. Co.*, 426 S.W.2d 441 (Ky. 1968)).   Since *Webb*, both Kentucky courts and the federal courts of the Sixth Circuit that have had the opportunity to apply Kentucky law have consistently upheld the enforceability of insurance policy provisions that limit the time for bringing suit against the insurer to one year after the inception of the loss.  *E.g.*, *Edmonson v. Penn. Nat'l Mut. Cas. Ins. Co.*, 781 S.W.2d 753, 756 (Ky. 1989); *Robinette v. Venn*, 2004 WL 1909456, at *2 (Ky. Ct. App. Aug. 27, 2004); *Smith v. Allstate Ins. Co.*, 403 F.3d 401, 404-05 (6th Cir. 2005) (applying Kentucky law);[2] *Brown v. State Auto*, 189 F. Supp. 2d 665, 668-69 (W.D. Ky. 2001) (applying Kentucky law); *Heil v. State Farm Fire & Cas. Co.*, 2012 WL 3637652, at *3 (W.D. Ky. Aug. 23, 2012) (applying Kentucky law); *Edbrook v. Ohio Cas. Ins. Co.*, 2011

---

[2] Of note, *Smith v. Allstate Ins. Co.* addressed a one-year limitation provision almost identical to the one at issue here.  *See* 403 F.3d at 403.  In *Smith*, the Sixth Circuit recognized that "Kentucky courts have repeatedly enforced insurance contract provisions under which the time for suit began to run before the insured had a right to sue" to conclude that a one-year limitation provision  was nonetheless reasonable because "that period afforded the [insured] an adequate time for filing suit."  403 F. 3d at 405-06.

WL 6130917, at *2 (W.D. Ky. Dec. 8, 2011) (applying Kentucky law); *Tennant v. Allstate Ins. Co.*, 2006 WL 319046, at *5 (E.D. Ky. Feb. 10, 2006) (applying Kentucky law).

Plaintiff argues, however, for the application of the Kentucky Administrative Regulations, specifically 806 Ky. Admin. Regs. 12:095 § 6(4), to preclude enforcement of the one-year limitation provision.  (*See* Docket No. 38, at 10.)  "Because Safeco failed to notify Brantley as per this regulation," he insists, "Safeco may not now rely upon a limitations defense."  (Docket No. 38, at 10.)  But as Defendant points out, section 2, entitled "Scope and Purpose of this Administrative Regulation," disclaims:

> This administrative regulation establishes standards for the executive director in investigations, examinations, and administrative adjudications and appeals therefrom.  A violation of this administrative regulation shall be found only by the executive director.  This administrative regulation shall not create or imply a private cause of action for violation of this administrative regulation.

806 Ky. Admin. Regs. 12:095 § 2(3).  The plain language of this regulation states that it neither creates nor implies a private cause of action for an alleged violation.  Further, the regulation is directed at establishing administrative standards and assigns exclusive responsibility for finding a violation to the executive director.  Thus, because the regulation applies to administrative adjudications and creates no private legal rights, it does not operate to toll the limitations period here.  *See Hiscox Dedicated Corporate Member Ltd. v. Wilson*, 246 F. Supp. 2d 684, 694-95 (E.D. Ky. 2003) (finding that because 806 Ky. Admin. Regs. 12:095 does not create a private cause of action, a claimant's allegation that the regulation was violated did not defeat an otherwise valid motion for summary judgment); *see also Sullivan v. Am. Int'l Group, Inc.*, 2008 WL

405366, at *6 (E.D. Ky. 2008) (finding that an alleged violation of 806 Ky. Admin. Regs. 12:095 was without merit to support a bad-faith claim under the Kentucky UCSPA).

Therefore, the Court finds compelling support for enforcing the one-year limitation provision contained in the policy here.  Additionally, Ky. Rev. Stat. § 304.14-370 explicitly permits foreign insurers to limit the time for commencing suit against them.[3]  Here, Plaintiff's loss occurred in June 2009, but he did not commence this suit until September 2010.  (*See* Docket Nos. 1; 38, at 1.)  Accordingly, the Court finds that under established Kentucky law the one-year contractual limitation provision in the policy is both reasonable and enforceable, and Defendant is thus entitled to summary judgment because Plaintiff's claim is time-barred by the applicable one-year policy limitation.

## II.    Elliot's Opinions Must Be Excluded Because They Satisfy Neither the Helpfulness Nor Reliability Requirements of Rule 702.

The Court turns next to Defendant's motion in limine to exclude portions of the deposition testimony given by Plaintiff's expert, David Elliot, from evidence and at trial. (*See* Docket No. 34.)  The Federal Rules of Evidence provide that a witness qualified as an expert may testify only if his testimony: (1) "will help the trier of fact to understand the evidence or to determine a fact in issue," (2) "is based on sufficient facts or data," and (3) "is the product of reliable principles and methods," which the expert has "reliably applied . . . to the facts of the case."  Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharm., Inc.*, the U.S. Supreme Court outlined a nonexhaustive list of factors to guide

---

[3] A "foreign insurer" is one formed under the laws of a state other than Kentucky.  *See* KRS § 304.1-070(2).  Plaintiff has not disputed that Safeco is a foreign insurer within the meaning of the Kentucky statute.

district courts in assessing the reliability of proffered expert testimony.  509 U.S. 579, 593-94 (1993).  Thus, the Court's inquiry is flexible. S*ee id.* at 594; *Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).  "The gatekeeping inquiry is context-specific and 'must be tied to the facts of a particular case.'"  *Surles*, 474 F.3d at 295 (quoting *Kumho Tire*, 526 U.S. at 150).

Here, the parties do not dispute that Elliot is qualified to render expert testimony; rather, Defendant asserts that Elliot's opinions should be excluded because they "are not based upon a reasonable degree of probability or certainty, as is required for admissibility of expert testimony in Kentucky."  (Docket No. 37.)  Specifically, Defendant challenges Elliot's opinions as to the cause of damage to Plaintiff's property, which thus in turn affects whether that damage was covered by the policy.  Although Defendant incorrectly suggests that the Kentucky standard for expert testimony should govern, the applicable federal standard nonetheless warrants exclusion of Elliot's expert testimony.  *See Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 426 (6th Cir. 2009) (citing *Legg v. Chopra*, 286 f.3d 286, 289 (6th Cir. 2002)) ("[F]ederal law governs procedural issues, including evidentiary rulings made pursuant to the Federal Rules of Evidence.").

Principally, Elliot's proffered expert testimony must be excluded because it would not "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  That is, Elliot's proffered opinions simply would not aid a jury in determining the cause of damage to Plaintiff's property.  Having reviewed Elliot's deposition in its entirety, (*see* Docket No. 34-4), the Court is convinced that Elliot would

offer at best conflicting conclusions, and at worst no opinion at all as to the cause of damage. The following is a lengthy, but necessarily thorough review of Elliot's opinions regarding causation:

> Q:   When you were walking on the exterior of the property . . . did you see any indications at all that would make you think that water had entered the property from the ground level?
>
> A:   Absolutely.
>
> . . . .
>
> . . . I just remember, yep, this flooded. I mean, it was fairly obvious to me that it had.
>
> Q:   And when you say that, was it obvious to you that it had flooded in one specific area of the house or more of a general --
>
> A:   Generally. I would say that the majority of that lot was under some elevation of water.
>
> (Docket No. 34-4, at 28.)
>
> * * *
>
> Q:   . . . I believe in [your] report, you have a sentence here in the second paragraph there, the second sentence there, which says it is immediately apparent moisture has migrated into the space from a location at side entrance door.
>
> A:   Uh-huh. Yes.
>
> . . . .
>
> Well, I mean, it was noticeable that there was water that -- rising water on the property came in this door. . . .
>
> . . . .
>
> Q:   . . . [D]id you see any evidence then in the kitchen itself of water coming in from the outside that had gotten into the kitchen area and damaged the kitchen area at all?
>
> A:   I think there was water in the whole residence that came in from the outside.
>
> . . . .
>
> From the -- you know, from rising water or water running from this waterway thing I was describing that kind of comes down the corner of the

drive. . . .

(Docket No 34-4, at 31-32.)

　　　* * *

Q:　. . . [D]o you remember anything specifically that you could tell us about that indicated to you that water had come from ground level into [the kitchen] area?

A:　. . . [T]here was evidence through the entire house to include the kitchen that water had come into the space, and I think initially came in the door, but probably over some time, you know, the whole house was probably under water.

　　　. . . .

Q:　Okay.  Now, do you remember what room you went in after you went in the kitchen?

A:　I mean, I just know that we walked, you know, the entire – the entirety of the space, and the only thing that was, you know, unusual about it, other than the flood damage, was that there were one or two locations, I think, in one bedroom and maybe in another -- I can -- it seems like I can recall there were -- there were two locations where it was apparent to me that water had come in either through the roof -- most likely through the roof but through the ceiling and had migrated down.

(Docket No. 34-4, at 34-35.)

　　　* * *

Q:　[I]n this particular matter, you've been indicated as an expert for Mr. Brantley.  So I'm trying to see if we can pinpoint and how reasonably sure you feel . . . whether it was just one place that this occurred or two or whatever?

A:　I'm -- I'm reasonably sure there were two locations, and I'm reasonably sure that it came from the roof.  But I wouldn't completely rule out that there could have been a plumbing leak, could have been a condensation leak off the HVAC.  I didn't get up into the attic space to investigate the plumbing, the HVAC, so on and so forth.

(Docket No. 34-4, at 36-37.)

　　　* * *

Q:　And when you got up on the roof, did you see any large tree limbs on the

roof itself?

A:   No . . . .

Q:   Were you told anything about whether or not a tree limb had ever at any particular time fallen on the house?

A:   No.  And there wasn't any consequential kind of evidence that would lead me to believe there was unless it happened prior to this metal roof having gone on, but the metal roof itself didn't appear to have any significant damage due to limbs or otherwise fallen on it.

Q:   Did you see any -- when you got up on the roof, did you see any actually holes in the roofs or tears or anything?

A:   No, nothing of consequence.  I mean, there was a few minor dings but nothing of consequence.

Q:   In regard to the rooms that you thought there was indication that water had come down into those rooms from up above as opposed from the down ground level . . . .

. . . .

. . . did you see any areas . . . that would lead you to believe that some type of tree limb or some type of thing had hit those particular areas of the roof?

A:   I looked specifically because I was trying to find this, you know, or at least hopefully identify what clearly would have been the source of that leak, and there wasn't anything there that that was immediately obvious.

(Docket No. 34, at 40-42.)

* * *

Q:   You actually didn't go in [the house] until October of 2009?

A:   Right.

. . . .

Right. So I mean, it's hard for me to say had it leaked since May of 2008 till October of 2009.  You know, I can't speak to that, but it was obvious that the roof had leaked.

Q:   Is there any way, based upon your expert engineering and construction backgrounds, to estimate how long it had been since the damage had been there; in other words, coming up from above?

A:   No.  I don't know that I could have -- I mean, had I known that would be something we would need or [Brantley] would have asked for, I may have tried to have done some forensics to have determined it, but it would still

have been a little bit of a guess. . . .

. . . But, no, I don't feel like that I could have reasonably predicted how long it had been leaking and/or leaking for a long period of time.

(Docket No. 34-4, at 44-45.)

\* \* \*

Q:   . . . Did you see indications in [the] bath area of water coming in from the ground level as well?

A:   The best I recall . . . there was -- there was evidence that there had been flood water through the entire house.

Q:   Every room?

A:   Every room.

(Docket No. 34-4, at 46.)

\* \* \*

Q:   Did you see anything in the living area of any damage to the house that would have in your estimation come from above?

A:   No.  But the thing that I can't -- you know, there's no way to discern -- I mean, there was obviously water that stood inside the space.  It's obvious that water came into this from the outside as arising water, but there was also a fair bit of water as evidence of what that came in the roof . . . .

. . . .

. . . So I can't -- I can't speak to how much water was attributable to the roof versus how much water was attributable to the flood.

(Docket No. 34-4, at 50-51.)

\* \* \*

Q:   . . . Now, you've indicated in your [report], it says, in my opinion, the roof leaks were caused by an unusually high wind and rain event that is not normal.  And then you've also indicated today that it could have been as a result of other reasons, in other words, over a period of time; is that correct?

A:   You're talking about the roof leaks?

Q:   Yes, sir.

A:   They could be -- they could have been over a period of time or they could
     have been specific to a couple of a particular events.  I'm just not capable,
     you know, even then or now, of discerning whether it was, you know --
     usually you can tell if had been an ongoing kind of problem.

     . . . .


Q:   Okay.  Would it be your opinion that with regard to the damage in the
     rooms that -- other than the two rooms, the bedrooms that you've talked
     about, would it be your opinion that whatever damage there was was a
     result of ground water?

A:   I think as I said earlier, I don't think there's a way for me to discern.  There
     was obviously water that came through -- came in through the, I'm going to
     say, the ceiling, and I'm assuming from the roof.  Was it enough water by
     itself to have caused the damage that was caused, I don't know.

     . . . .

     So I can't say to you that I think that the rising water, you know--
     consequently, I can't say that I don't think the rising water was everything
     on itself either.  Does that make sense?  It's difficult to separate the two
     because they both occurred, what I assume, at nearly the same time.

Q:   Would you say that for every room in the house that same thing you just --
     the statement you just made?

A:   Yeah. . . .


     (Docket No. 34-4, at 52-55.)


     * * *

Q:   Now, the two rooms that you talked about it in coming in through the roof,
     though, you've indicated it could have come from any number of different
     ways?

A:   It could have -- there could have been a -- I guess, it could have been a
     plumbing leak or a condensation leak, but my experience tells me it was a
     roof leak.  You know, it walks like a duck.  It quacks like a duck.  That's a
     poor design.  And good construction can't hardly overcome bad design.

     (Docket No. 34-4, at 56.)

* * *

Q:   And what you're indicating is that based upon information you were
     provided in conjunction with this case . . . you cannot depict when water
     started coming in via the roof?

A:   That is accurate.

Q:   Could be as far back as May 2008 or maybe even before that?

A:   Possibly so.

Q:   And within any degree of reasonable certainty you cannot say?

A:   I cannot say.

     (Docket No. 34-4, at 57.)

* * *

Q:   And so if we were to summarize your opinion in this case as it relates to
     this particular residence and the water damage, it would be fair to say that
     you think the water damage came up what some people typically call rising
     water or a flood?

A:   Yes.

Q:   And you think water came in from the top through the roof?

A:   I agree, yes.

Q:   And to further summarize, you can't say that it's a 50/50 split or a 70/30 or
     a 90/10?

A:   That's correct.  I don't know how you would be able to discern.
     . . . .
Q:   You've also indicated that . . . there were a number of ways that water
     could have come in through the top; is that correct?

A:   That's correct.

Q:   It could have come in through a period of time; that is, not from a traumatic
     event, a storm, but from lack of maintenance or just a defect as a result of

installation of the roof, correct?

A:   Correct.
. . . .

Q:   And as we sit here today, you cannot tie it to a particular day?

A:   No.

Q:   Nor can you tie it to any particular month?

A:   No.

(Docket No. 34-4, at 67-70.)

In sum, Elliot's proffered testimony would not assist the trier of fact in deciding whether the damage to Plaintiff's property was caused by groundwater flooding or through water entering through the roof; whether damage to the roof was caused by the storm or by some other cause; whether any water damage from the ceiling was attributable to the storm, a plumbing leak, or an HVAC leak; or generally when and how the damage occurred.  Further, Elliot offers no suggestion that his conclusions are based upon reliable principles or methods that he applied to the facts of this case.  Elliot's "report," which is merely a letter consisting of four substantive sentences across two paragraphs, (*see* Docket No. 34-4, at 86), further dissuades the Court from concluding that his opinion testimony satisfies the reliability and helpfulness requirements of Rule 702.  Moreover, the Court cannot conclude that Elliot's proffered expert testimony satisfies any of *Daubert*'s factors or any other consideration substantiating its reliability in this case.  Accordingly, Elliot's expert testimony is properly excludable under Rule 702.

III.   **The Evidence of Record Does Not Support Plaintiff's Common Law and Statutory Bad-Faith Claims**

In its December 1, 2011, Memorandum Opinion and Order, the Court granted Defendant's motion requesting that this matter be bifurcated into two separate proceedings, the first encompassing Plaintiff's breach of contract claim and the second his bad-faith claims, and also granted Defendant's request to stay discovery on the latter. (*See* Docket No. 27.)   Notwithstanding the Court's bifurcation order, Defendant now moves for summary judgment on Plaintiff's bad-faith claims.  (*See* Docket No. 35-1, at 22.)  In his response opposing summary judgment, Plaintiff does not raise the issue of the Court's previous order bifurcating his claims and staying discovery on his bad-faith claims. (*See* Docket No. 38, at 11.)  Instead, Plaintiff argues that his bad-faith claim does not fail as a matter of law because he is entitled to coverage under the policy and Defendant does not have a viable limitations argument.  (*See* Docket No. 38, at 11.) Accordingly, because the issues of bifurcation and staying bad-faith claim discovery have not been raised, the Court assumes that Defendant's motion for summary judgment on Plaintiff's bad-faith claims is ripe for adjudication.

In order to state a claim under the Kentucky UCSPA, a plaintiff "must meet a high threshold standard that requires evidence of 'intentional misconduct or reckless disregard of the rights of an insured or a claimant' by the insurance company that would support an award of punitive damages."  *Phelps v. State Farm Mut. Auto. Ins. Co.*, 680 F.3d 725, 731 (6th Cir. 2012) (quoting *Wittmer v. Jones*, 864 S.W.2d 864, 890 (Ky. 1993)); *see also United Servs. Auto Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky. Ct. App. 2003) (describing the requisite threshold showing as "high indeed").  In *Wittmer v. Jones*, the Kentucky

Supreme Court specifically described the standard as that of "outrageous" conduct by the insurer.  864 S.W.2d at 890.  After a plaintiff has met this initial showing, the *Wittmer* Court held he must then establish three elements to maintain a claim of bad faith:

> (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.

864 S.W.2d 864, 890 (Ky. 1993) (quoting *Federal Kemper Ins. Co. v. Hornback*, 711 S.W.2d 844, 846-47 (Ky. 1968) (Liebson, J. dissenting)); *see also Phelps*, 680 F.3d at 731.   "[I]n order to survive a motion for summary judgment, a plaintiff in a bad faith action must come forward with evidence, sufficient to defeat a directed verdict at trial, which reveals some act of conscious wrongdoing or recklessness on the part of the insurer."  *Nat'l Sur. Corp. v. Hartford Cas. Ins. Co.*, No. 11-5965, slip op. at 6 (6th Cir. Oct. 9, 2012) (quoting *Matt v. Liberty Mut. Ins. Co.*, 798 F. Supp. 489, 434 (W.D. Ky. 1991)).   In a very recent opinion involving the Kentucky UCSPA, the Sixth Circuit, quoting a decision by this Court, stated: "Kentucky's standard is high. . . . Bad faith 'is not simply bad judgment.  It is not merely negligence.  It imports a dishonest purpose of some moral obliquity.  It implies conscious doing of wrong. . . . It partakes of the nature of fraud.'"  *Id.* (second alteration in original) (quoting *Matt*, 798 F. Supp. at 433).

Thus, the initial question here is whether Plaintiff has met his initial burden of showing intentional misconduct or reckless disregard of his rights by Defendant that would support an award of punitive damages—*i.e.*, "outrageous conduct."  Though, as the Sixth Circuit recently noted, "[o]ddly, the second and third elements of [the *Wittmer*]

test depend on evidence similar to the threshold inquiry." *Phelps*, 680 F.3d at 731 (citing *King v. Liberty Mut. Ins. Co.*, 54 F. App'x 833, 838 (6th Cir. 2003)). "The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that . . . the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." *Id.* (quoting *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368, 376 (Ky. 2000)). "Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury." *Nat'l Sur. Corp.*, No. 11-5965, slip op. at 6 (quoting *Bult*, 183 S.W.3d at 186). Without deciding the issue whether Defendant was obligated to pay Plaintiff's claim, the Court is nevertheless convinced that Plaintiff cannot satisfy the high Kentucky standard to maintain his bad-faith claims. Therefore, summary judgment is appropriate.

This conclusion is informed by the Court's review of the entirety of the parties' submitted exhibits, which includes: the report and testimony by Plaintiff's proffered expert, David Elliot, (Docket Nos. 34-2; 34-4); the affidavits and report by Defendant's experts, Charles Skaggs and Kate Dicks, (Docket No. 35-8); Plaintiff's examination under oath, (Docket No. 35-4); testimony by Tim Decker, Plaintiff's maintenance man, (Docket No. 35-9); and correspondence between Plaintiff and Defendant, (Docket Nos. 35-6; 35-7). In viewing these submissions in a light most favorable to the Plaintiff, the Court is satisfied that Plaintiff has failed to meet his burden of showing that "there is sufficient evidence from which reasonable jurors could conclude that . . . the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was

unreasonable." *Phelps*, 680 F.3d at 731 (quoting *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368,376 (Ky. 2000)).

Defendant maintains that it denied Plaintiff's claim because "the damage to the property was the result of surface water [which] was not a covered payable loss." (Docket No. 35-1, at 4.)  Defendant further insists that even if Plaintiff's claim fell under the policy's coverage for "windstorm or hail," it still properly denied Plaintiff's claim under the policy's "concurrent causes" exclusion.  (*See* Docket No. 35-1, at 11.)  After Plaintiff filed his claim in June 2009, Defendant began its investigation by sending Alan Roemer of Pacesetter Claims Services to investigate the subject property.  (Docket No. 35-1, at 4-5.)  Roemer visited and photographed the property, which Defendant says "showed there was no damage to the flat metal roof from a tree limb and that water entered the house from ground level."  (Docket No. 35-1, at 4.)  On this basis, Defendant concluded that the damage was excludable as the result of surface water, which was not a covered payable loss under the policy.  Plaintiff then wrote to Defendant requesting that Defendant reevaluate his claim, (Docket No. 35-7), and despite that the one-year limitation period for filing suit had already elapsed, Defendant commissioned Skaggs to reassess the property, (s*ee* Docket No. 35-1, at 5).  Skaggs' report, which was cosigned by another civil engineer, concluded: "The shear failure or split of the metal roof was not caused by storm damage, wind, or debris," because "[t]he opening in the metal roofing . . . was not characteristic of storm related damage or tree limb impact, as large limbs or trees would have caused multiple dents, scratches, and impressions in the area of impact." (Docket No. 35-1, at 6; 35-8, at 6-7.)  These conclusions, Skaggs asserted, "are based on

an analysis of the information collected during the site visit, researched data and engineering knowledge, and information provided by the insured and the client." (Docket No. 35-8, at 7.)  "This inspection, investigation, and report have been conducted consistent with standard practices within the industry and represent a reasonable degree of engineering certainty based upon research data and information gathered during [the] site visit."  (Docket No. 35-8, at 7.)

Neither Plaintiff's own testimony nor that of his maintenance man, Tim Decker, support a different conclusion.  Moreover, that testimony offers nothing to support a viable claim of bad faith.  Plaintiff acknowledged that he never saw any limbs on the roof of the property, that he did not get on the roof to inspect the damage after the storm, and that he was never told that limbs were present on the roof after storm.  (*See* Docket No. 35-4, at 3.)  He even stated that he personally did not remember anything about the storm other than "we had a lot of wind and rain."  (Docket No. 35-4, at 4.)  Decker similarly offers little other than to acknowledge that the house was flooded by groundwater coming in the doors.  (*See* Docket No. 35-9, at 4-5.)  Decker states multiple times that he did not see any water coming in from the ceiling, nor was he aware of any problems with the ceiling.  (*See* Docket No. 35-9, at 6-7.)  In sum, Plaintiff offers no evidence that even begins to satisfy the threshold for a bad-faith claim.  And even if Elliot's testimony was not excluded, Plaintiff still would not meet the requisite showing to proceed on his bad-faith claim.  The Court has thoughtfully reviewed the whole of Elliot's testimony, and considered its potential impact on this conclusion.  Nonetheless, the Court concludes that

even considering Elliot's proffered testimony, Plaintiff's evidence of record does not suffice to defeat summary judgment on his bad-faith claims.

To conclude, Defendant has presented a viable basis of fact upon which it concluded that Plaintiff's claimed loss was excludable under the Policy. As such, regardless whether Plaintiff's loss was in fact the result of a covered loss, Plaintiff has offered no evidence tending to support his bad-faith claim. Therefore, even in viewing the facts in a light most favorable to Plaintiff, the Court finds that summary judgment is appropriate because Plaintiff has not met his initial burden of showing intentional misconduct or reckless disregard of his rights by Defendant; moreover, the evidence of record shows that Plaintiff cannot satisfy the second element of *Wittmer*'s three requirements by showing that Defendant lacked a factual basis for denying his claim. The Court has no doubt that further discovery in regard to Plaintiff's bad-faith claims would not alter this conclusion. Accordingly, Plaintiff has failed to meet his burden of showing that "there is sufficient evidence from which reasonable jurors could conclude that . . . the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable," and summary judgment is appropriate. *Phelps*, 680 F.3d at 731 (quoting *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368,376 (Ky. 2000)).

CONCLUSION

For the foregoing reasons, Defendant's Motion in Limine, (Docket No. 34), is GRANTED.

Further, Defendant's Motion for Summary Judgment, (Docket No. 35), is GRANTED, and an appropriate Order will issue separately.

cc:     Counsel